Grafton, }
April 4, 1916. }

### Joseph H. Barker *v.* Publishers Paper Company.

### Publishers Paper Company *v.* Joseph H. Barker.

A description of doubtful meaning in a deed is sufficient to give color of title to one actually occupying to the fullest extent of what the deed might be construed to cover.

A deed may serve as color of title however groundless may be the supposed title thereby conveyed and though another may have a deed of the same land executed about the same time.

The possession of land by one claiming to hold by adverse possession may be exclusive notwithstanding the exercise of rights of flowage and travel, where such rights are mere easements and not intended or understood as a denial of the occupant's general title to the premises.

Where possession is maintained under color of title, the presumption is that the possession is maintained according to the deed,—*i. e.* as asserting title.

By a description in a deed giving as a bound the land of A is intended the land owned by A at the date of the deed, and the fact that A formerly had title to the described premises and has a deed therefor is immaterial if A's title has been lost by adverse possession.

A description in a deed—"the X farm as described in the deed of A to B"—includes all the X farm as deeded by A to B, though the land known as the X farm is less extensive at the date of the subsequent deed under construction.

A deed of "the X farm" purporting to bound it by lands of abutting owners, but failing to name one abutting tract, conveys the whole farm to such unnamed tract, although the owner of the latter has an invalid deed of an adjoining portion of the farm.

Upon the issue of title by adverse possession, admissions of one in possession after the title had been so acquired, as to the nature of his holding, are admissible only against himself and his privies.

(1) TRESPASS, *quare clausum*, to try the title to real estate.

(2) BILL IN EQUITY, to establish the divisional line between the parties and to enjoin the suit at law.

The cases were tried together by *Kivel*, J., without a jury, at the September term, 1913, of the superior court. A verdict was found for the plaintiff in the action at law, and a decree was made in the equity case locating the line as claimed by Barker. The company filed a bill of exceptions, which was allowed. The facts are stated in the opinion. The chalk on p. 162 shows the *locus.*

*Clarke C. Fitts* and *Hermon E. Eddy* (both of Vermont) and *Edgar W. Smith* (*Mr. Eddy* and *Mr. Smith* orally), for the Company.

*Branch & Branch* (*Frederick W. Branch* orally), for Barker.

PEASLEE, J. The parties are herein designated as plaintiff and defendant as they appear in the action at law. The issue is the title to a small strip of land in Rumney, bounded northeasterly by Stinson's pond, northerly by Stinson brook, northwesterly by a highway and southerly by the plaintiff's land. Barker claims title by deed and by the adverse possession of his predecessors, and the company claims by deed. Upon the trial it was found that the claim of title by adverse possession was established, and that, if this was not so, the practical construction adopted and followed by the parties for many years had established the line as claimed by Barker.

In 1821, one Jones owned a mill situated on the brook some fifteen or twenty rods westerly of the highway, with "a certain water privilege bounded as follows, viz., the brook leading from Stinson's pond." One Hoit owned all the land lying southerly of the brook, and later known as the "pond farm." In that year Hoit sold to Jones a "piece of land and water privilege the land bounded as follows: Beginning at the outlet of Stinson's pond, so-called, in Rumney; thence following the brook down four rods below David Jones clover mill, thence south eight rods; thence easterly on a straight line opposite the first mentioned bound eight rods from the same; thence to the first mentioned bounds, from thence around the pond northeasterly to David Jones land. The privilege of raising or flowing said pond five feet." The defendant claims that this description is so accurate that there can be no question what land

was conveyed by it; and that the southerly line runs to the pond at a point eight rods from the outlet, thus enclosing the disputed area. This claim lies at the foundation of a large part of the argument.

It is probably true that, if the meaning of the deed were to be ascertained solely from the language used, this conclusion as to what was conveyed would be reached. But it is also true that the description is not definite and certain. It does not describe the land conveyed as bordering upon the pond; and it conveys flowage rights along the same shore which it is claimed was conveyed in fee by the same deed. The description of the southerly line as "easterly on a straight line opposite the first mentioned bound eight rods from the same," might be interpreted in various ways. There is much room for doubt or dispute and the acts of the parties in applying the deed to the land are of importance.

It is Barker's position that the line between the Jones acre and the pond farm has always been treated as running in a northeasterly direction to the brook at a point where it is crossed by the highway at Hutchins' bridge; and that if this is not proved, or does not control if proved, title to that part of the Jones acre lying easterly of the highway has been acquired by adverse possession. It has been found that there was such adverse possession, and if there is no legal error in this finding it is not necessary to examine the other ground relied upon.

Several objections to the finding have been argued. The possession relied upon is that of one Fales, who took a deed of the farm in 1855. It is claimed that this deed does not give color of title to the land in question. The deed bounds the land northerly by the pond and westerly by Blake's land. Blake then owned the saw mill, and had bought two acres off the westerly end of the farm. A northeasterly corner of this two-acre piece was the southwesterly corner of the Jones acre. If the titles were as the defendant claims, the easterly line of the two-acre piece and the southerly line of the Jones acre met at substantially a right angle and the pond farm would be correctly described as bounded northerly by the pond and Blake's land and westerly by Blake's land. No language conveying such an idea is to be found in the deed to Fales, and the line between the mill property and the pond farm is also described as a northerly and southerly one in deeds of the mill property given in 1867 and 1890, and in deeds of the farm given in 1887. It is suggested that this discrepancy between the deeds and the location of

the land as claimed by the defendant is accounted for by the fact that on the old plan of Rumney the brook is shown as running south, when in fact it runs west, and that therefore north, as used in the deeds, means east. One answer to this is that as the line as claimed by the defendant runs north and then east, the proposed correction makes the description erroneous as to the first part of the line. The adjoining land was largely cleared and tilled, and it is a fair argument that, if there had in fact been any such abrupt angle in the line, the parties would have known it and would have described the line accordingly. When the description in a deed is of doubtful meaning, it is sufficient to give color of title to one actually occupying to the fullest extent of what the deed might be construed to cover. The law is so stated in the case relied upon by the defendant in argument. *Wells* v. *Iron Co.*, 48 N. H. 491, 513 *et seq.*

The fact that at about the time Fales took his deed of the pond farm the owners of the mill property conveyed it by deeds referring to earlier conveyances which describe the Jones acre in terms claimed to be sufficient to cover the land in controversy, is not controlling upon the question of Fales' color of title. If he had a deed which might cover this land, his color of title was not destroyed by the fact that some one else had a deed of the same land. Upon the issue of his title by adverse possession the invalidity of the deed under which he entered is immaterial. "If the entry be under color of title, the possession will be adverse, however groundless the supposed title may prove to have been." *Farrar* v. *Fessenden*, 39 N. H. 268, 282.

It is also claimed that there was no evidence of twenty years possession by Fales and his son. But, giving the evidence the construction most favorable to the plaintiff, it appears that Charles Fales' remembrance of the place covers the period from 1867; that from then until 1892 the tract was fenced in and used for pasturage; that a mill and mill yard were maintained upon it for some years; that trees were cut from it from time to time and portions of it were cleared. This was an occupancy for such uses as the land was adapted to, and was of such a character as to give notice of the possession so held. While the evidence was not conclusive, it was sufficient to support a verdict upon the issue raised. *Hopkins* v. *Deering*, 71 N. H. 353, and cases cited.

Another objection made to the finding of title by adverse possession is that a part of the land was flowed at times by the owners of the mill, and that a right to a winter road across it had been con-

veyed and was exercised. Hence it is said the possession could not have been exclusive. These rights were conveyed by very early deeds, and their existence in no way affects the remainder of the title to the premises. No legal obstacle appears to gaining title by adverse possession to the land subject to the apparently admitted rights of flowage and travel. *Marshall* v. *Taylor,* L. R. [1895] 1 Ch. 641; *Randall* v. *Sanderson,* 111 Mass. 114; *Sowles* v. *Butler,* 71 Vt. 271. These rights were mere easements. They are not things in possession. They lie in grant rather than in livery of seizin. Possession remains in the owner of the servient estate, and it is by possession that the title here claimed is established. If the possession is to the full extent of the right claimed, it is evidence of title to such right. To prevent the running of the statute, an entry by the owner must be such as to give notice of his denial of the right claimed by the occupant. It could well be found that the mere exercise of the clearly established rights of flowage and travel was not in any way intended or understood as a denial of the occupant's general title to the premises. *Linen* v. *Maxwell,* 67 N. H. 370.

It is said that there is no evidence that the possession was adverse. This element was supplied by the deed which gave color of title. The presumption is that his possession was according to his deed, that is, as asserting title. *Brown* v. *Peaslee,* 69 N. H. 436, and cases cited. In the absence of color of title there must be some other evidence of the nature of the claim under which possession is held. But color of title may show both the extent and the character of the possession under it. *Waldron* v. *Tuttle,* 4 N. H. 371. And where the occupation of the land is not merely constructive but actual, the sole office of color of title is to show how the possession is held.

No error of law is found in the conclusion that a title had been acquired by adverse possession; and it is to be taken as an established fact that in 1892 John Peppard, as holder of the Fales title, owned the *locus* as a part of the pond farm, and that the line between the farm and the mill property was at the highway. The record title of others to the *locus,* if it ever existed, had been destroyed.

The ruling that a title by adverse possession cuts off a mere paper title was correct. If such prescriptive title was shown, it was not defeated by the fact that Proctor, as owner of the mill property, had a deed of the same land, nor by the fact that when Peppard sold to Chase in 1892 he deeded only to Proctor's land. This was not Proctor's land and the deed conveyed the land up to the other

tract which Proctor did own. The amount of land conveyed was not cut down by the fact that Proctor had a deed of land which he did not own.

But it is said that all this goes for nothing because both tracts—the pond farm and the mill property—were subsequently owned by the defendant, and therefore it is immaterial from which source it acquired title. Because of a claim that the titles merged in the common owner, it is argued that the situation previous to such merger cannot be considered.

The question of merger does not arise upon the facts presented. It may be that the defendant owned all the land south and east of the brook, and could have carved out from the whole such a portion as it chose to sell. But what it did was to sell according to a description which is to be applied to the situation as it existed when the ownership was divided. The defendant deeded to the plaintiff's grantor, Fletcher, the pond farm "as described in the deed" Chase to James. This was a conveyance of the pond farm which Chase owned and sold to James. Under this deed it was essential to show what Chase owned, because that is what the defendant sold. How Chase obtained title was important only as a means to an end. The fact to be proved was that he owned it.

The defendant also objects to the consideration of what the pond farm consisted of prior to its conveyance to Fletcher for the reason that the deed describes what was conveyed by metes and bounds, and that therefore the more general term pond farm is limited accordingly. The rule invoked is undoubtedly correct, but it does not apply here. The deed refers to and sets out the description in another deed of the farm, which was given at a much earlier date. The boundaries named are the lands of other parties; so that the question at once arises: what lands did those parties own? It is true, as claimed, that the deed did not convey any of Proctor's land, and could not be made to do so by showing that his land was known as a part of the pond farm. But this does not prevent inquiry into the extent of his ownership. In short, the issue here is simply the ordinary one of the location of a division line.

In the deed Chase to James, the pond farm is described as bounded north by Stinson's pond and land of Proctor. In fact the farm was bounded northerly by the pond, the brook and the Proctor land, unless the deed of "the brook" for a water privilege gave the mill owners title to the bed of the stream. If the latter view is correct, the Chase deed fully and correctly describes the *locus.*

But assuming, as the defendant claims, that the deed of the brook conveyed only water rights, the Chase deed is defective in that it gives only a part of the northerly boundaries of the land conveyed. The defendant's claim seems to be that the omission in the Chase deed is an acknowledgment that the *locus* is a part of the mill property, and that it has the effect of reinstating the record title thereto which had been destroyed by the adverse possession of Fales.

It is essential to keep in mind that at this time Chase, and not Proctor, owned the *locus*, and that it was known as a part of the pond farm. The deed did not convey anything to Proctor. It conveyed to James all the pond farm excepting a schoolhouse lot. If the deed had been of the pond farm without other description, it would have conveyed the *locus*. It is not less effective because in addition to the general description it undertakes to specify the abutting lands, etc. On the north it names the pond and the Proctor land. It appears that Proctor's land did not extend to the pond. As to the intervening space no northern boundary is named, and of course the boundary there is the limit of the pond farm owned by Chase.

While the admission in the Chase deed could not operate as a transfer of title to Proctor, it was of evidentiary importance. It bore upon the extent and nature of the earlier possession relied upon by the plaintiff to establish title. Presumably it was considered in arriving at a decision of those questions.

Many of the exceptions which have been argued are immaterial to the conclusion which has been reached. It was unnecessary to find whether the defendant had a record title to the *locus*, because of the finding that such title had been lost by the adverse possession of Fales.

The early deeds of the pond farm, under which Fales did not claim, were immaterial upon the issue of his adverse possession. If their admission in evidence was erroneous, it had no effect upon the findings of fact upon which the disposition of the case rests.

The various exceptions to evidence of possession by Fales, were based upon the theory that his title was made immaterial by a subsequent merger of titles, and are disposed of by what has been said upon that subject.

One Sanborn was in possession of the pond farm for about two years in the early nineties. He had a bond for a deed "if Peppard could give a title." Peppard failed to do so, and Sanborn moved away. He was allowed to testify that he did not occupy the *locus*,

but his testimony that he did not make any claim to it was excluded. This evidence relates to a time subsequent to the acquisition of title by adverse possession. It was admissible only upon the issue of the practical location of the original line between the plaintiff's land and the Jones acre. Its only bearing upon the plaintiff's title by adverse possession to a part of the Jones acre would be as an admission that such title did not exist. It had no tendency to show the limits of the land so acquired. It was merely the occupant's admission by silence that he had no such title. But title to real estate cannot be acquired or lost in this way.

"No doubt a disseizor may abandon the land, or surrender his possession by parol, to the disseizee, at any time before his disseizin has ripened into a title, and thus put an entire end to his claim. His declarations are admissible in evidence to show the character of his seizin, whether he holds adversely or in subordination to the legal title. But the title, obtained by a disseizin so long continued as to take away the right of entry, and bar an action for the land by limitation, cannot be conveyed by a parol abandonment or relinquishment, it must be transferred by deed. One, having such title, may go out of possession, declaring he abandons it to the former owner, and intending never again to make any claim to the land, and so may the person who holds an undisputed title by deed; but the law does not preclude them from reclaiming what they have abandoned in a manner not legally binding upon them." *School District* v. *Benson*, 31 Me. 381, 385.

Such conduct is important when it is a part of that relied upon to show adverse possession, an agreed line, or the practical application of a deed by the parties. And such an admission, if made by those who had gained the adverse title or by their privies through whom title is claimed, would be evidence that the possession under which such title had been gained had not been adverse. But the plaintiff does not claim under Sanborn, nor rely upon his possession or claim of right to establish title. If title were claimed through Sanborn, his assertions by act, word or silence while he held an interest in the land, to the effect that Fales' possession had not been adverse, would be evidence of that fact against one claiming under the declarant. But they are not admissible when the declarant is not "a party-opponent or a predecessor of his in title." 3 Wig. Ev. *s.* 1780 (5).

As the excluded evidence was not admissible upon the issue of title by adverse possession, upon the decision of which the conclu-

sion in the case is rested, it is not necessary to consider whether it ought to have been received as bearing upon another issue which is now immaterial.

*Exceptions overruled.*

All concurred.