## Olwine *versus* Holman.

1. One claiming under a deed is bound by the reservations and recognition of title in another which is contained in it.

2. When a vendor sells a piece of land which is enclosed with his other land and the piece sold continues to be enclosed and used and occupied by the vendor as before, such occupancy will be deemed to be in subservience to the right of the vendee and not adverse thereto, unless the intention of the vendor to hold adversely be manifested by some act of hostility to the title of the vendee. See also 7 *W. & Ser.* 160.

3. The owner sold a lot of ground in 1814 which was then enclosed in a field with other ground belonging to him, and it so continued till 1831 when he conveyed the farm of which the field formed a part to another, with a reservation of the lot previously sold : *Held*, that such conveyance was a recognition of the title to the lot previously sold and was conclusive against the last grantee that the former possession of the lot was not adverse.

ERROR to the Common Pleas of *Chester county*.

This was an action of ejectment by Maria R. Olwine *v.* William W. Holman, who had for his guardians George Baugh and H. Neff, to recover the undivided *half part* of lot No. 47, in the town of Bath, at Chester Springs, Chester county ; and also the undivided half part of the one hundredth part of the Bath lot in said town, which lot contained 101 perches and fifty-nine hundredths. The plaintiff claimed under deed to her by *Abraham* Olwine, dated 18th February, 1852.

The claim was under James Bones, who at one time owned a tract of 152 acres, on which was the Yellow Springs, now called the Chester Springs. In 1814, he had a town laid out on this tract, which he called "Bath." The lots were 101 in number. The lot which embraced the spring was called the "Bath Lot." The others were numbered from 1 to 100. He determined to grant with each lot conveyed a right to the Bath lot. He disposed of a number of the lots, and with each one conveyed he granted the one-hundredth part of the Bath lot. On the part of the plaintiff, it was contended that the deed conveying each lot, also conveyed a *fee simple* title to the undivided one-hundredth part of the Bath lot ; whilst on the part of the defendant it was contended that the right granted was a right appurtenant to each of the 100 lots, viz. a right to go upon the Bath lot, and use the water of the spring.

A portion of the lots was disposed of by a lottery, and lot No. 47 was one of them. The title exhibited on part of the plaintiff was as follows :—

A deed from James Bones and wife to Jacob Nailor and James Dilworth, dated 27th November, 1814, for lot No. 47, and the undivided hundredth part of the Bath lot, to hold as tenants in common.

[Olwine *v.* Holman.]

This deed was recorded on 9th April, 1824.

2. A deed from the sheriff of Chester county to *Abraham* Ol-wine, dated 11th March, 1830, for the interest of *Jacob Nailor* in the said premises.

3. A deed from Abraham Olwine to Maria R. Olwine, the plaintiff, dated February 18, 1852, for the interest obtained under the sheriff's sale and deed.

The defendant claimed under the statute of limitations, which to be effective it was necessary should go back to February, 1831, the action being brought on 23d February, 1852.

It appeared that some of the lots conveyed by James Bones were fenced and built upon. A majority of them were not fenced separately, but were used for farming purposes by Bowes, and so used until 1830. This was the case with lot No. 47. In 1830 Bones removed from the farm, and Anthony W. Olwine,—who was his son-in-law,—in April, 1830, took possession of the premises which Bowes left. The character of the agreement under which he entered did not appear. Afterwards Bones and wife, by deed dated 14th *April*, 1831, conveyed to said Anthony W. Olwine the tract of 152½ acres, being the same farm on which the lots had been laid off; but in this deed were reserved thirty-four lots, which had been previously conveyed by Bones to other persons, and lot No. 47 was one of those reserved, the same having been previously sold to Nailor and Dilworth.

On the next day after the date of this deed, viz., on the 15th April, 1831, Anthony W. Olwine mortgaged the whole tract to Thomas Woodward for $7500, with a reservation of 24 of the 34 lots reserved in the deed by Bones; but lot No. 47 was not one of the 24. It had, with seven others, been inserted in the draft of the mortgage, but they were erased.

To May Term, 1847, a *fi. fa.* was issued on a judgment of Woodward against Anthony W. Olwine for $500, and under this the mortgaged premises were levied upon, with the exception of the lots reserved in the mortgage. On an *alias vend. exp.* to February Term, 1838, the premises levied on were sold, and were struck off to *Abraham Olwine*, but he not having fully complied with the terms of sale, a deed was executed for them by the sheriff to Margaret Holman, who was the next highest bidder, conveying the mortgaged premises subject to the reservations therein. Margaret Holman took possession of the premises and of lot No. 47; afterwards had an expensive house built, partly on lot No. 47, and continued to occupy it till her death. After her death, it was, in 1850, taken by her eldest son, Frederick Holman, under proceedings in partition; and he died in 1851, leaving his son William W. Holman, a minor, as his heir, who was *the defendant* in this suit.

From the time that *Anthony* W. Olwine entered into possession

[Olwine v. Holman.]

of the farm in 1830, until 1836, he used lot 47 with the Bath lot, lot No. 47 not being separately enclosed, but being in one of the fields which was cultivated. The land was assessed in the name of Anthony W. Olwine till 1838, when Mrs. Holman took possession. In 1836, Anthony W. Olwine sold the undivided half of the spring property to Joseph Wood for above $7000. In this sale the half of lot No. 47 was included. In some months afterwards, Olwine and wife, and Wood, united in a sale to Horace Weeks for $42,000. This sale purported to be of the whole tract of 152 acres, reserving about 12 lots, lot No. 47 not being included in the reservation. Subsequently, the sale under the *mortgage* took place as the property of Anthony W. Olwine.

HAINES, J., in his charge to the jury, observed that Anthony W. Olwine used the property as his own—paid taxes, and, *on two* occasions, sold it as his own. He expressed the opinion that the evidence, if believed, was sufficient to establish an adverse possession of the lots in dispute—that this was a question for the determination of *the Court*, and he instructed them that a hostile possession, for a period of 21 years, had been shown on the part of the defendant. That the Bath lot was in the same category as lot No. 47.

Two points had been submitted on part of the plaintiff; the first of which was, that the possession of one tenant in common is the possession of the other, and to constitute ouster so as to give title by 21 years' possession, the possession must commence by some clear, open, positive, and unequivocal act, amounting to an open denial of the right of the co-tenant. The 2d was, that no such ouster had been shown by the defendant.

As to the first, he observed that the jury, under the circumstances referred to, might presume an actual ouster, though none be proved; and he disaffirmed the *second* point.

Verdict was rendered for the *defendant*.

It was assigned for error: 1. That the Court erred in charging that A. W. Olwine held the property adversely. 2. That in the opinion of the Court the evidence was sufficient to establish an adverse possession for 21 years of the lots in dispute. 3. In charging that the Bath lot stood in the same category with that of Lot 47. 4. In disapproving the plaintiff's *second* point. 5. In charging that A. W. Olwine mortgaged lot No. 47 to Thomas Woodward. 6. In charging that *Abraham* Olwine concealed his title to the said lots, and suffered them to be sold as the property of another.

*Pennypacker* and *Hirst*, for plaintiff in error.—Olwine's possession, during the *first year* he occupied the farm, was under Bones—not adverse or hostile. In April, 1831, Bones and wife con-

veyed to Olwine, excepting lot No. 47.   Olwine, being a party to the deed, recognised an outstanding title to lot No. 47.   He had no possession of it separate from the farm, and did nothing to challenge the right of the true owner.   He returned for taxation the first year of his residence 66 acres of land, and four lots separately, which was about one-fifth less land than was in the tract. Lot No. 47 was not returned separately for taxation.   It was further said that James Dilworth conveyed his half of lot No. 47 to A. W. Olwine by deed dated 1st June, 1828; and that A. W. Olwine conveyed such half to Jesse Griswell by deed dated 26th March, 1829; and that these deeds were recorded in 1829.   It was alleged that this conveyance to Griswell of one half of the lot, was evidence that A. W. Olwine in 1830 did not make adverse claim to it.   Possession follows *the legal title*.   When a person is in possession under no recorded title, the possession is notice of every interest which the occupant claims.   But if he has put a title on record, his possession is referred to that title, and he is considered as holding under it: 5 *W. & Ser.* 429 ; 6 *Ser. & R.* 185.

The evidence does not show that during the first year of Olwine's residence at the Springs he asserted any ownership of the lot. There is not distinct proof that he then cultivated it, or paid taxes for it.   The lot lay in the corner of the field, and if he did cultivate it it was as a part of the field.   The lot not having been fenced separately and no exclusive possession being taken, the occupation was not adverse: 3 *Harris* 526; 7 *W. & Ser.* 154–160–1.   His occupancy was like that of Bones, during which Nailor and Dilworth and those claiming under them were confessedly the owners.

As to the *third* specification.   It was submitted that there was no evidence in the case to justify the Court in charging that the plaintiff had lost her title in *the Bath lot* by ouster.   In relation to it the extent of the evidence was, that the occupants of the two hotels exercised acts of ownership over the Bath lot by using it. The occupants of the hotels were tenants in common of the Bath lot along with others.   It was open and accessible to all who chose to use it.   As between tenants in common, who have unity of possession, in order to constitute adverse possession there must be an actual ouster, claiming exclusively: 10 *Ser. & R.* 182; 9 *Barr* 227; 1 *Jones* 189; 2 *W. & Ser.* 299; 3 *Watts* 77.   No ouster was shown.

*Hickman* and *Darlington*, contrà.—It was contended that the defendants had such a possession of the lot No. 47 and Bath lot, as justified the jury in finding for them.   It was not necessary that Bones, prior to 1831, should have declared that he held in hostility to the true owner.   If a person enters into possession of land, and holds it, without more, the presumption is that he

[Olwine v. Holman.]

claims title. It was alleged that a possession exceeding 21 years, under such circumstances, would give title: 2 *Watts* 27, Rung v. Shoenberger; 6 *W. & Ser.* 318; 1 *Jones* 195; 9 *Watts* 567.

It was said that though there was a distinction taken in books between adverse possession and *ouster*, as between tenants in common, there was no real difference in the legal effect of the two: 1 *W. & Ser.* 191; 10 *Ser. & R.* 188.

In the mortgage to Woodward lot No. 47 was not excepted.

*Abraham Olwine,* the grantor of the plaintiff, lived near the spring, and could not be ignorant of the fact that he never had enclosed lot No. 47, or paid taxes upon it, and that it was occupied and farmed by his brother Anthony.

The act of mortgaging, the sales to Wood and Weeks, and the sheriff's sale, were notorious and of record. Abraham knew that Mrs. Holman was in possession of lot No. 47 after the deed to her, and was erecting a large house partly on it. He knew that he himself was indebted and insolvent; and for nearly 22 years he made no claim of title.

In another case to which allusion was made in the counter statement, it was contended that a grant may be presumed from facts and circumstances, and reference was made to 10 *Ser. & R.* 390; 1 *Greenleaf Ev.* § 17; 4 *Pick.* 245; 7 *Wheaton* 59; 11 *East* 56; 1 *Barr* 434; 7 *Johns. Rep.* 556; 3 *McCord* 340; 2 *Jones* 312; 9 *Watts* 442. The facts and circumstances alluded to were— 1. That, after the conveyance made by Bones in 1814, of the lots to which the *Bath rights* were attached, the lots remained unclaimed by any act of the grantees till 1838, when the sheriff's sale took place. 2. That the grantees made no improvement on the Bath lot or paid taxes on it. 3. Bones when he disclaimed title to certain of the lots assumed to own the *Bath rights,* and to convey them to A. W. Olwine, as against Abraham Olwine, his son-in-law. 4. The mortgage by A. W. Olwine. 5. That the Bath rights were not reserved in the sheriff's sale. 6. That Abraham Olwine was insolvent from 1838. 7. That no claim was made for the Bath rights from 1838 till suits brought in 1852. It was contended that such circumstances, in connexion with the lapse of time, were sufficient to raise a presumption of a grant of the Bath rights.

The opinion of the Court was delivered by

LEWIS, J.—The plaintiff in error exhibited on the trial below a complete paper title to the land in controversy. The defendant there relied on the statute of limitations. This ejectment was brought on the 23d February, 1852. The adverse possession must therefore go as far back as the 23d February, 1831. But how are the facts? Both parties claim under James Bones. On the 28th November, 1814, James Bones conveyed the ground in dis-

[Olwine *v.* Holman.]

pute to Jacob Nailor and James Dilworth. On the 14th April, 1831, James Bones conveyed to Anthony Olwine a farm of 152½ acres. This tract included within its boundaries certain lots of land which had been previously conveyed by James Bones to other persons, among these, lot No. 47, being one of the lots in dispute, but in that conveyance James Bones *expressly reserved from the conveyance to Anthony W. Olwine, lot No. 47, the same having been previously sold to Nailor and Dilworth.* This deed is not set forth in the paper-book, and we therefore take the reservation from the statements of the parties and from the facts given in the charge of the Court. The defendant below claims under Anthony W. Olwine, as well as under James Bones, and is therefore bound by all that is contained in the deed between these parties of the 14th April, 1831. This deed is, in judgment of law, a recognition of the title derived from James Bones, prior to the conveyance to A. W. Olwine; and, if executed by the parties, is conclusive upon the question of adverse possession against Olwine, the grantee, and all persons claiming under him by title subsequently derived. Whatever may have been the state of the possession before the execution of that deed, it ceased to be adverse to the legal owner at that time. It is true that if a complete title had been acquired by 21 years' adverse possession before the execution of that deed, the recognition of title in others contained therein would not have concluded the rightful owner; but when no title had at that time been acquired, when it was only in process of acquisition, and when the acquisition depended altogether upon the existence and duration of an *adverse* possession, any act of those whose privilege it was to keep up such possession, showing conclusively that it was not kept up, is decisive. If the continuity of the possession be broken for a single day before the 21 years have elapsed, the previous possession goes for nothing, and the wrongdoer must commence *de novo.*

Entertaining this view of the case, it does not seem necessary to consider the nature of the possession which existed previously to the 14th April, 1831. But even if the case depended upon that possession, unembarrassed by the deed of that date, we do not see how its character is shown to be adverse. When a vendor sells a piece of land enclosed with his other land, and the piece sold continues afterwards to be enclosed, and used and occupied by the vendor as before, such occupancy will be deemed to be in subservience to the right of the vendee, and not adverse thereto. This principle was announced in Burkholder *v.* Sigler, 7 *W. & Ser.* 160, and we have no hesitation in reaffirming it on the present occasion. A vendor, after conveyance and before delivery of possession, is to be regarded as a trustee for the vendee, so far as regards the possession, just as he was a trustee of the title before conveyance. If he wishes to change the character of the posses-

[Olwine *v.* Holman.]

sion, he must manifest his intention by some act of hostility to the title of his vendee, plainly indicating to the latter the intention to deny his right and to hold adversely to it.    We have no evidence of such intention during the time that Bones held possession.    Nor is there any evidence that Olwine's possession, before the conveyance, was of a character different from that of Bones.    We see nothing to show that he was anything more than a tenant of Bones. His subsequent purchase from Bones, and the circumstances under which he came there, tend to repel every presumption that he held in hostility to the title so purchased.    The first act of hostility to the title of the plaintiff below is to be found in the mortgage which Olwine made to Woodward on the 15th April, 1831.    Even this is susceptible of explanation.    It was perfectly proper in Bones to reserve lot No. 47 from his conveyance to Olwine on the 14th April, 1831, because the former did not claim any title to it, and did not intend to convey it; but when Olwine, the next day, was about to grant a mortgage to secure a debt to Woodward, it was equally just that lot No. 47 should be included, because Olwine was the owner of a moiety of that lot by virtue of a previous conveyance from James Dilworth, of the 1st June, 1828.    He was a tenant in common with the person from whom the plaintiff derives title.    The proper course of describing the extent of his interests ought to have been adopted, but the omission to do so may have been from carelessness, and not from any intention to claim the whole of the property.    Be that as it may, the claim to the whole, even if then made, came too late for the purpose, because the ejectment was brought within twenty-one years from that time.

The Bath lot seems to stand in the same category with lot No. 47.    There was no evidence from which the jury could properly find an adverse possession of either for the period of 21 years. It is of the utmost importance that land titles should be held by rules of property not likely to be varied by the feelings or prejudices growing out of each particular case.    In all cases where the facts are clearly ascertained, and the question is one of law merely, the Court should take the responsibility of deciding it. The title of the rightful owner should be protected with unshaken firmness.    Under the evidence in the cause, the jury ought to have been told that the plaintiff was entitled to recover.

Judgment reversed and *venire facias de novo* awarded.