INN LE'DAERDA, INC., a Pennsylvania
Corporation, et al., Appellants,

v.

Benjamin I. DAVIS et al.

INN LE'DAERDA, INC., a Pennsylvania
Corporation, et al., Appellants,

v.

Wilbert F. MARSHALL and Thelma M.
Marshall, his wife.

Clyde Edward SEIGLER, Jr., et al., Appellants,

v.

Robert H. PHILLIPS et al.

Superior Court of Pennsylvania.

June 28, 1976.

152

154

Frank Kernan, C. Francis Fisher, Pittsburgh, for appellants.

James Arensberg, Tucker, Arensberg & Ferguson, Pittsburgh, Ira F. Bradford, Jr., Coraopolis, Philip R. McLaughlin, Campbell, Thomas & Burke, Pittsburgh, for appellees.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

SPAETH, Judge:

These appeals involve six actions of ejectment brought by appellants to establish the proper northern boundary line of a tract of land located in Findlay Township, Allegheny County.[1] Appellants James F. Farland and El-

---

1. The action against appellees Davis and Mazzaro was filed October 1, 1971; the remaining actions were filed March 2, 1972.

sie M. Farland are the record owners of this tract, and appellant Inn Le'Daerda, Inc., is by virtue of an assignment of an agreement of sale between the Farlands and one William Hallam the equitable owner. The appellees are the respective owners of six lots to the north of and abutting appellants' tract.

At one time all of the land involved in this dispute was the easterly part of a patent given to Robert Greenlee in 1792. This part was last conveyed in a single tract in 1832, when one Moses Ewing took the land by deed of Thomas Greenlee's heirs. By subsequent transfers, Moses Ewing's land was divided into northern and southern portions, of which appellants now hold the southern. The northern portion eventually, in 1946, came to be owned by one Frank Alimena, Sr., who by a series of conveyances divided it into the lots now owned by appellees.[2]

During the course of the above transfers, there developed three different deed descriptions of the common boundary line between appellants' tract to the south and appellees' several lots to the north: (1) the description used in 1879, when the land was first divided; (2) the description used in the deeds to the southern tract—including appellants' deed—from the time of a deed by Mary McCallister to George McCallister in 1902; and (3) the description used in the deeds to the northern tract and its subdivisions—including appellees' deeds— from the time of a deed by A. D. McCabe to Elizabeth Gundelfinger in 1919. Of these three lines, the one de-

By order dated November 8, 1973, the actions were consolidated for trial. The trial judge has appropriately remarked that "[d]epending upon one's point of view, the issues here presented could be deemed as either presenting a common law conveyancer's dream or, on the other hand, a horrible nightmare to one who sees the law of real property as a tidy, compact and precise expression of ownership of real property."

2. The ownership of a small, triangular piece of land located at the point where the northern and southern tracts meet with the western part of the original patent is the subject of an appeal in *Murrer v. American Oil Co.*, 241 Pa.Super. 120, 359 A.2d 817 (filed, June 28, 1976).

scribed in the last description is the most southerly; also, it runs relatively close to an old fence and tree line.[3]

The trial judge did not attempt to locate the proper boundary line according to the deeds; instead he concluded that each of the appellees with their respective predecessors in title had established title to the most southerly line of adverse possession. The court *en banc* affirmed the trial judge's decision, and adopted his opinion as its own.

Because the trial judge did not make specific findings of fact as to each appellees' proof of adverse possession[4] we have made an independent examination of the record for the underlying facts necessary to support his conclusion. *Cf. Lewkowicz v. Blumish,* 442 Pa. 369, 275 A.2d 69 (1971).[5] Before discussing the results of that examination, however, it is necessary to untangle a number of legal principles.

I

A. *Proof of Adverse Possession*

■■ The requirements that must be met by one claiming title by adverse possession are settled. In *Conneaut Lake Park, Inc. v. Klingensmith,* 362 Pa. 592, 594–95, 66 A.2d 828, 829 (1949), the Court stated:

[O]ne who claims title by adverse possession must prove that he had actual, continuous, exclusive, visible,

3. The tree line now extends across, or along, only part of the properties involved. Although it appears that the fence still existed in 1946, its present condition and the duration of its existence do not appear from the record.

4. Rather, in his opinion he cites examples of acts of possession from among the appellees and states generally that each appellee followed a similar course of conduct. For example, the opinion refers to specific occupancy of appellee Phillips's lot for no more than eight years.

5. In the usual case, the findings of fact of a trial judge, when affirmed by the court *en banc* have the weight of a jury verdict, and the appellate court will not disturb them if adequately supported by the evidence. *Wheatcroft v. Albert Co.,* 407 Pa. 97, 180 A.2d 216 (1962).

notorious, distinct, and hostile possession of the land for twenty-one years. Each of these elements must exist, otherwise the possession will not confer title.

And in *Parks v. Pennsylvania R. R. Co.*, 301 Pa. 475, 481–82, 152 A. 682, 684 (1930) (citations omitted), it is stated:

> A sporadic use of land, by one without title to it, will not operate to give him a title, no matter how often repeated. . . . It is true that residence is not necessary to make an adverse possession within the statute of limitation; the possession may be adverse by enclosing and cultivating the land . . . but nothing short of an actual possession, permanently continued, will take away from the owner the possession which the law attaches to the legal title; temporary acts on the land, without an intention to seat and occupy it for residence and cultivation or other permanent use consistent with the nature of the property, are not the actual possession required. . . . Such occupation must be exclusive, and of such a character as compels the real owner to take notice of the possession of the disseisor. . . .

B. *Appellees' Claims Under Color of Title*

 The opinion of the trial judge indicates that he gave weight not only to appellee's acts of possession but also to the fact that each appellee claims under color of title. That fact, however, did not relieve appellees of the burden of proving actual possession for twenty-one years.

> It is true that when a person enters upon unoccupied land, under a deed or title, and holds adversely, his possession is construed to be coextensive with his deed or title, and the true owner will be deemed to be disseised to the extent of the boundaries described in that title. Still, his possession beyond the limits of his actual occupancy is only constructive. If the true owner

be at the same time in actual possession of part of the land, claiming title to the whole, he has the constructive possession of all the land not in the actual possession of the intruder, and this though the owner's actual possession is not within the limits of the defective title.

*Hunnicutt v. Peyton*, 102 U.S. 333, 368, 26 L. Ed. 113 (1880). Here, not only appellees but also appellants claim under color of title, and the record shows that during the period that appellees claim, appellants were in actual possession of their tract. Therefore, if in fact the correct location of the boundary line pursuant to the deeds is—as appellants assert—north of the line to which appellees claim, the law would place appellants, as rightful owners, in constructive possession to the line of all and not in appellees' actual possession. *Deputron v. Young*, 134 U.S. 241, 10 S.Ct. 539, 33 L.Ed. 923 (1890); *McArthur v. Kitchen*, 77 Pa. 62 (1874); *Potts v. Everhart*, 26 Pa. 493 (1856). It follows that as the parties claiming title by adverse possession, appellees were required to prove actual possession of the overlap; proof of constructive possession under color of title was not enough. *Deputron v. Young, supra; McArthur v. Kitchen, supra; Potts v. Everhart, supra*.

The fact that appellees' deeds purport to include the disputed overlap is, however, significant to the extent that it enables each appellee to tack his possession to that of his predecessors in title in order to establish the requisite twenty-one years. Tacking to the possession of predecessors in title is permitted where the possessions are continuous. *Shaffer v. Lauria*, 50 Pa.Super. 135 (1912). Each predecessor must have claimed title to the property in dispute, and in transferring to his successor must have purported to include it. *Shaffer v. Lauria, supra* at 141. In the present case, the deed under which appellees' common predecessor in title, Frank Ali-

mena, Sr., took possession in 1946, and the deeds from Alimena to each appellee (and to each intervening predecessor in title), all specified the most southern boundary line. Accordingly, in proving adverse possession, each appellee was entitled to include proof of possession by his predecessors in title back to and including the possession by Frank Alimena, Sr.

C. *The Significance of the Fence and Tree Line*

The trial judge considered the establishment of the old fence and tree line "of great importance", and he noted that "[a]lthough the fence did fall into a state of disrepair and some of the trees no longer stand, the line to this day remains visibly intact throughout all of the properties involved."

 There is, however, no evidence of the origin of the fence and tree line, or of the precise extent and condition of either during the period that appellees claim to have occupied the land up to the line as a boundary.[6] It is therefore clear that appellees can not rely on the fence and tree line by itself to sustain a claim of adverse possession. A fence that appears neglected and abandoned is inadequate to support such a claim. *Dimura v. Williams*, 446 Pa. 316, 286 A.2d 370 (1972). The fence must be "substantial." *Id.* at 318, 286 A.2d at 371.

Appellees suggest in their briefs that the fence line "constitutes and has constituted a consentable line marked on the ground and established by the parties to these lawsuits or their respective predecessors in title," and that "[t]he occupation up to this old fence line for over

6. The trial judge placed the establishment of the line sometime before 1939. Appellants' engineer testified that the line of trees now extends across but one-half to two-thirds of the properties, beginning east of the Davis property. There is no evidence upon which to base a contrary conclusion. Appellees' witnesses testified that the Davis lot had been strip-mined in 1952. Apparently the fence and tree line were destroyed at that time. Photographs submitted by appellees clearly support this conclusion. *See* Appellees' Joint Exhibits D and E.

21 years by each of the Defendant-Appellees and their respective predecessors in title has given to each of them an uncontestable right up to the fence line whether or not the fence line was on the original boundary line . . .."

Although the term is utilized by appellees, it is clear that there is no evidence to support a finding of what is technically referred to as a "consentable line." Such a finding requires evidence of (1) a dispute with regard to the location of a common boundary line, (2) the establishment of a line in compromise of the dispute, and (3) "the consent of both parties to that line and the giving up of their respective claims which are inconsistent therewith." *Newton v. Smith*, 40 Pa.Super. 615, 616 (1909). "[W]here such a line has been clearly established and the parties on each side take possession or surrender possession already held up to that line, it becomes binding, under the application of the doctrine of estoppel." *Id.*

Although the parties may be bound if, merely having doubt as to the correct boundary location, they enter into a compromise, a "consentable line" is not created "if the parties, from misapprehension, adjust their fences, and exercise acts of ownership, in conformity with a line which turns out not to be the true boundary; or permission be ignorantly given to place a fence on the land of the party . . .." *Perkins v. Gay*, 3 S. & R. 327, 331 (1817).

The establishment of this kind of boundary is always a matter of compromise, in which each party supposes he gives up for the sake of peace something to which in strict justice he is entitled. There is an express mutual abandonment of their former rights, upon an agreement, that whether they be good or whether they be bad, neither is to recur to them on any pretence whatever, or claim anything that he does not derive from the terms of the agreement. Each takes his chance of obtaining an equivalent for every-

thing he relinquishes, and if the event turn out contrary to his expectations, so much the worse for him. If there be no intention of fraud, no unfair dealing, and neither party has more knowledge of the fact misconceived, than the other had, the contract will bind.

*Id.* at 332.

Our courts have long recognized, however, that a boundary line may be proved by a long-standing fence without proof of a dispute and its settlement by a compromise. In *Dimura v. Williams, supra,* the court noted:

It cannot be disputed that occupation up to a fence on each side by a party or two parties for more than twenty-one years, each party claiming the land on his side as his own, gives to each an incontestable right up to the fence, and equally whether the fence is precisely on the right line or not. *Id.* 446 Pa. at 319, 286 A.2d at 371.

In such a situation the parties need not have specifically consented to the location of the line.[7] *Dimura v. Williams, supra* at 319, 286 A.2d at 371. It must nevertheless appear that for the requisite twenty-one years a line was recognized and acquiesced in as a boundary by adjoining landowners. *See Miles v. Pennsylvania Coal Co.,* 245 Pa. 94, 91 A. 211 (1914); *Reiter v. McJunkin,* 173 Pa. 82, 33 A. 1012 (1896). As the court in *Reiter* noted, "[t]he value of such a fence does not rest upon the acts of him who alleges its existence merely, but upon its recognition and maintainance, [*sic*] by the owners of the farms which it separates, as the line between them." *Id.* at 85, 33 A. at 1012. Thus, in *Omensetter v. Kemper,* 6 Pa.Super. 309 (1898), the defendant did not prevail, since although he established the existence of a fence for some thirty-five

7. This theory of possession is also not the same as that of adverse possession by a fence. *See Dimura v. Williams, supra; Miles v. Penna. Coal Co.,* 245 Pa. 94, 91 A. 211 (1914). Thus, the fence relied upon need not be substantial. *Dimura v. Williams, supra* at 318, 286 A.2d at 371.

years, he failed to establish its character as a boundary line for the requisite period. With regard to the fence, this court pointed out:

> It does not appear who built or maintained it; whether it was intended to mark the true line or a consentable line; whether it was recognized by former owners as indicating the boundary, or whether [the defendant's wife's] predecessors in title had claimed and held up to it. *The merely calling it a division or line fence by the defendant and his wife, in their testimony, does not make it one.* It was their duty to supply the jury with facts."

6 Pa.Super. 309, 318 (emphasis added).[8]

The record here does not contain the necessary evidence, as to any appellee, that for twenty-one years either a fence line or a tree line was maintained as a dividing line between the appellants' and appellees' properties. The lower court itself noted that the fence had deteriorated and that some of the trees no longer stand; and as to some appellees there is evidence clearly contradicting appellees' assertion.[9]

### D. *Appellants' Acknowledgements*

Finally, the trial judge's opinion contains the statement that appellants and their predecessors in title have "on *various occasions* acknowledged their own belief that this line is as established by the line of trees and

8. *Cf. Potts v. Everhart, supra.* There an owner maintained a fence near but within the actual line of his tract of land for 50 years. The owner of the property to the south was not permitted to claim the fence as the mutual boundary. "[A] man is under no legal or moral obligation to set his fences on and not within the lines of his land." 26 Pa. at 498. The owner does not lose title to the land outside his fence as long as there was no actual entry and ouster on the unenclosed part. *Id.*

9. *As to appellee Davis, see* n. 6 *supra.* The evidence indicates that some of the mobile homes on appellee Marshall's lot extend over this claimed boundary line. Appellee Phillips testified that in maintaining his lawn he went "back to the tree line, and as far back as we felt desirous."

the fence", and that appellees' claim "has been *repeatedly* acknowledged by the [appellants] and their predecessors in title." (Emphasis added.) In that the only evidence of acknowledgement consists of appellant Farland's in-court admission that he had assumed that the tree line corresponded to the line described in his deed and that his predecessor had pointed out the tree line as the boundary,[10] we do not find the lower court's statement supported by the evidence.[11]

## II

From the foregoing discussion it is evident that the only issue is whether, as to each appellee, the evidence is sufficient to show "actual, continuous, exclusive, visible, notorious, distinct, and hostile possession of the land for twenty-one years." *Conneaut Lake Park, Inc. v. Klingensmith, supra.* Keeping this in mind, we shall now examine the evidence of each appellee's claim. The following diagram is intended to illustrate in a general way the relative positions of the properties involved and the respective owners of appellees' lots since 1946:

| Alimena | Alimena | Alimena | | Alimena | Alimena |
|---|---|---|---|---|---|
| Davis & Mazzaro | Prycl Marshall | Donovan Alexander | | Roman | Brown Seigler |
| | | Dixon | Phillips | | |
| (A) | (B) | (C) | (D) | (E) | (F) |

:-----Farland-----:

**10.** Contrary to the trial judge's opinion, there is no evidence that appellants or their predecessors in title acknowledged the fence line. In fact, appellant Farland denied that his predecessor had mentioned the fence line at all.

**11.** Appellant Farland's belief with regard to the location of the true line would not in itself bind or estop appellants from claiming to the correct boundary. *See Schraeder Mining Co. v. Packer*, 129 U.S. 688, 9 S.Ct. 385, 32 L.Ed. 760 (1889).

## A. *The Davis-Mazzaro Lot*

This lot was owned by appellees' predecessor in title Frank Alimena, Sr., from 1946 until he conveyed it to appellees Davis and Mazzaro by deed dated June 21, 1971. Alimena testified that when he bought the lot, the southern boundary line was marked by a fence and a line of trees.

The existence of the fence and line of trees was never testified to again, and as has been indicated in note 6, *supra*, both were apparently destroyed in 1952 when the lot was strip-mined. The mining went on for only one year, and the lot was leveled off.

There was testimony that the State kept cinders on the lot, but neither the time nor the location within the lot was ever specified. Although appellee Davis testified that the State had a storage shed and an ash pile on the lot when he and appellee Mazzaro acquired it in 1971, there was no testimony as to when these were first placed on the lot. There is no evidence regarding any use of the lot from 1953 until 1971.[12]

This evidence was insufficient to establish continuous adverse possession for twenty-one years.[13]

## B. *The Marshall lots*

This land consists of two adjoining lots immediately to the east of the Davis-Mazzaro lot. Frank Alimena, Sr., owned the two lots as part of his larger tract from 1946 until 1963, when he conveyed them by single deed to B. J. Prycl, who conveyed them in 1964, again by single deed, to appellee Marshall.

---

**12.** None of the appellees offered evidence of any use prior to that beginning with Alimena in 1946.

**13.** Even if we attribute to the Davis lot all of the activity occurring on the immediately adjacent land to the east (see discussion of appellee Marshall's lot *infra*) while it was still part of a single tract owned by Alimena until 1963, there would remain a gap in the proof of adverse use from 1963 until 1971.

Although the record is confusing in places, it is fair to say that from 1946 until 1950 this land was, with Alimena's permission, farmed up to the fence line. The farming stopped in 1950, when Alimena sold the lot to the east of Calvin Donovan. In 1951, an excavation for a trailer court was begun, and the next year the first trailers were installed by Alimena. These trailers were located within the disputed strip of land "pretty close" to the fence line. They have remained there, the property being maintained and operated continuously as a trailer camp. The present water and sewage system for the trailers was also installed by Alimena and extends along the fence line.

This evidence was sufficient to establish adverse possession of the disputed strip by appellee Marshall and his predecessors in title for the requisite period of twenty-one years.

### C. The Dixon Lot

This lot was part of the Alimena tract until 1950, when it was conveyed as the western half of a larger single lot to Calvin Donovan. In 1954 Donovan conveyed the larger single lot to Russell R. Alexander. In 1960 Alexander conveyed the eastern half to appellee Phillips, retaining the western half until 1967, when he conveyed it to appellee Dixon.

The evidence reveals that this lot was part of the property farmed to the fence line from 1946 until 1950. When Donovan bought the larger single lot in 1950 he built a house on the eastern half—the part that is now appellee Phillips's lot—and maintained a lawn and garden back to the fence line. The Alexanders occupied and maintained the larger single lot in a similar manner until 1960. In 1960 the division of the larger single lot by sale of the eastern half (including the house) to Phillips left the western half unoccupied and apparently without permanent improvements. However, from 1960 until

1967, Phillips at the request of the Alexanders, who had moved to Florida, maintained the lawn on the western half back to the fence line. Since acquiring the western half in 1967, appellee Dixon has kept it cleared back to the fence line. In 1968 he moved a home onto the lot, and later built a shed at the back.

From the above it appears that whether appellee Dixon has established title to the fence line by adverse possession depends upon whether the maintenance of a lawn from 1960 to 1968 in itself without any other occupation of the lot is sufficient to sustain such a claim.

In *Hutchison v. Little Four Oil & Gas Co.*, 275 Pa. 380, 119 A. 534 (1923), the Court stated:

> If the possession proved is "inconsistent with the possession or right of possession by another" it is sufficient to found a title upon, provided it is of such a character . . . as owners of similar land in the vicinity usually maintain regarding their own property
>
> . . . .

*Id.* at 387–88, 119 A. at 536 (citations omitted).

We think that given the prior use of the disputed strip as a lawn in connection with the residence during the possession of the larger lot by Donovan and Alexander, the continued maintenance of the lawn by Phillips at the request of the Alexanders was sufficient to constitute adverse occupancy. Cf. *Lyons v. Andrews*, 226 Pa.Super. 351, 313 A.2d 313 (1973). Therefore, we conclude that the evidence was sufficient to establish adverse possession of the disputed strip by appellee Dixon and his predecessors in title for the requisite period of twenty-one years.

D. *The Phillips Lot*

The evidence of the use of this lot from 1946 to 1960 has just been recited. Since 1960, appellee Phillips has maintained the lot as a residential property with a lawn back to the fence line. Therefore, we conclude that

the evidence was sufficient to establish appellee Phillips's claim of adverse possession.

### E. *The Roman Lot*

 This lot was owned by Alimena from 1946 until it was conveyed by Alimena to appellee Roman in 1953. Prior to 1950, this lot was part of the land that was farmed. When Roman acquired the lot in 1953, it was a field up to the fence line. Since acquiring the lot, Roman has planted grass, built a house in 1954 or 1955, placed a shed on the west rear corner, and kept the property cleared to the fence line. However, there is no evidence of adverse possession back to the line claimed from 1950, when the farming ceased, until 1953, when Alimena conveyed the lot to Roman.[14] Accordingly, the evidence was insufficient to establish continuous adverse possession for twenty-one years.

### F. *The Seigler Lot*

 This lot was owned by Alimena from 1946 to 1960, when he conveyed it to David Brown, who conveyed it to appellee Seigler in 1965. Without considering the evidence of possession since 1960, it is enough to note that the record contains no evidence of possession from 1950 until 1960.[15] Accordingly, the evidence was insufficient

14. Appellee Roman cannot rely on the activities of Alimena during this period on what is now the Marshall lot. The sale of the intervening lot to Donovan in 1950 severed these lots, and in such a situation, possession of one lot would not result in constructive possession of the nonadjacent lots still held by him. *Cf. Crist v. Boust*, 26 Pa.Super. 543, 548–49 (1904). Furthermore, as noted in Part I *supra*, each appellee's claim is limited to that property actually occupied. *Deputron v. Young, supra; McArthur v. Kitchen, supra; Potts v. Everhart, supra.*

15. The testimony of Frank Alimena, Jr., that the Browns purchased in 1947 or 1948 and proceeded to build on and occupy the lot appears erroneous. Frank Alimena, Sr., testified that the sale was on February 3, 1960; this is substantiated by the deed offered into evidence by appellee Seigler. As to the relevance of the activities of Alimena on the Marshall lot during the period from 1950 to 1960 *see* n. 14 *supra.*

to establish continuous adverse possession for twenty-one years.

## III

For the foregoing reasons, we enter the following order:

As to appellees Marshall, Dixon, and Phillips, we find the evidence sufficient to sustain the respective claims of adverse possession to the line as described in their deeds and therefore affirm the lower court's decision in their favor.

As to appellees Davis, Mazzaro, Roman, and Seigler, we find the evidence insufficient to sustain the respective claims and therefore reverse the lower court's decision as to them and remand for a resolution by the lower court of the conflicting deed descriptions of the common boundary line between appellants and these appellees.