## Lyons *v.* Andrews et al., Appellants.

Argued September 10, 1973. Before WRIGHT, P. J., WATKINS, JACOBS, HOFFMAN, SPAULDING, CERCONE, and SPAETH, JJ.

*Richard H. Roesgen,* with him *McNerney, Page, Vanderlin & Hall,* for appellants.

*John P. Campana,* with him *Campana & Campana,* for appellee.

OPINION BY SPAETH, J., December 11, 1973:

This case involves a dispute between neighbors over the ownership of a strip of land lying between their properties. Plaintiffs (appellees) live at 226 North Main Street in the Borough of Hughesville, Lycoming County, Pennsylvania. They brought an ejectment action when defendants (appellants), who live at 220 North Main Street, erected a fence and claimed the disputed strip of land. Plaintiffs contend that the strip is theirs by virtue of the adverse possession of their predecessor in title. A jury heard the evidence and returned a verdict in favor of plaintiffs. Defendants filed motions for a new trial and judgment n.o.v., which the court en banc denied.

Main Street may be thought of as extending in a generally north-south direction; it intersects Race Street which extends in a generally east-west direction. 226 North Main Street (plaintiffs' premises) is on the corner of Main and Race, fronting on Main to the west and Race to the north. 220 North Main Street (defendants' premises) is next to and south of 226 North Main Street; it too fronts on Main. The disputed strip of land has a frontage of fourteen feet on Main and lies to the north of defendants' premises. The south side of plaintiffs' house lies within the strip.

At one time all of the land—plaintiffs', defendants', and the disputed strip—was owned jointly or singly by Lawson H. Priest. A series of conveyances ensued. Without describing these, it is sufficient to note that neither the deed received by plaintiffs on September 18, 1969 nor the deed received by defendants on February 27, 1956 included the strip; it was conveyed to nei-

ther.* Plaintiffs maintain, however, that their grantor, Angelina Daye, acquired ownership of the strip by twenty-one years of possession adverse to the interests of defendants' predecessors in title, Lawson Priest and Mary E. Priest (Lawson's daughter and devisee), and that they as her successors now own it.**

To substantiate their claim, plaintiffs called as their principal witness Ellen Houseknecht, the granddaughter of Angelina Daye, who testified as follows.*** Angelina Daye lived continuously at 226 North Main Street from August 18, 1937 (the day she received the deed) until sometime in August 1969 except for a fourteen or fifteen month period in 1954 and 1955 when a tenant was in possession. Mrs. Houseknecht moved in when Mrs. Daye did; she was thirteen years old. She moved out in 1941, returned in 1943, and moved out again in 1955. She has lived at R.D. #2 in Hughesville ever since. After she moved out, she and her husband continued to visit Mrs. Daye on a regular basis.

Mrs. Houseknecht recounted various activities engaged in by herself, her grandmother, other family members, guests, and pets on the disputed strip between 1937 and 1969. As a teenager, Mrs. Houseknecht mowed the lawn along a line pointed out by Lawson Priest.

---

* On August 18, 1970, after plaintiffs indicated that they owned the strip and an examination of plaintiffs' and defendants' deeds revealed that it was included in neither, defendants secured a supplementary deed from Earl Hardesty, attorney for Mary E. Priest. Mary E. Priest inherited the land after Lawson Priest, her father, died in 1934. The validity of this deed is debatable. Aside from the question whether Mary E. Priest still owned the strip, it appears that she did not sign the deed, was incompetent when it was executed, and had not given her attorney the authority to sign on her behalf.

** No issue is raised as to plaintiffs' ability to rely on their predecessor's adverse possession in arguing that they have title to land she did not deed to them.

*** Mrs. Daye, a woman of advanced age, was unable to appear.

She trimmed hedges and did other gardening chores. The area maintained was within the strip. During the period when Mrs. Daye did not live in the house, the tenant performed these maintenance functions. After moving out, Mrs. Houseknecht, with the help of her husband, continued to mow the lawn and cut the hedges until Donald Andrews, one of defendants, purchased a power mower. Then, Mrs. Daye paid Mr. Andrews to cut the lawn, recording the payments in a diary, the entries in which were read into the trial record. Mrs. Houseknecht produced family photographs showing herself, other family members, and pets posing on the disputed strip. She noted that Mrs. Daye was quite strict in requiring that family activities be confined to the strip and not extend across the line she thought was the boundary. The photographs and a motion picture were used to illustrate approximately* where Lawson Priest and Mrs. Daye thought the boundary line was. Mrs. Houseknecht also testified that her husband cut down two trees within the disputed area without any objection from the Priests, and that he also erected a clothesline there.

Defendants contend that plaintiffs' evidence failed to establish two of the necessary elements of adverse possession.

"[O]ne who claims title by adverse possession must prove that he had actual, continuous, exclusive, visible, notorious, distinct and hostile possession of the land for twenty-one years: Parks v. Pennsylvania R. R. Co., 301 Pa. 475, 152 A. 682; Johns v. Johns, 244 Pa. 48, 90 A. 535; Boyer v. Lengel, 224 Pa. 357, 73 A. 323. Each of these elements must exist, otherwise the possession

---

* After this dispute arose, defendants removed certain items— including a wagon wheel and rose bush—that had been used as informal markers of the boundary. Mr. Andrews testified that this was done to protect the items from plaintiffs rather than to obscure the location of the line.

will not confer title: *Groft v. Weakland*, 34 Pa. 304." *Conneaut Lake Park, Inc. v. Klingensmith*, 362 Pa. 592, 594-595, 66 A. 2d 828, 829 (1949).

First, defendants argue that the use made of the strip by Angelina Daye was not exclusive. In their brief they refer to the testimony of defendant Donald Andrews, who listed various activities his family conducted within the disputed strip: "The Andrews family maintained a garden within the disputed strip; they planted tulips in the strip; they used a clothesline pole which had been placed within the strip; they maintained a trash barrel within the strip; they crossed this strip for access to Race Street; they used the land for various recreational purposes including planting golf cups in the area; and they erected a swing within the confines of the disputed land." [References to the record are omitted.]

This evidence cannot be given undue consideration. It is true that if defendants used the strip to an appreciable extent, Mrs. Daye's possession was not exclusive. "Except where two or more persons *jointly* claim adverse possession as cotenants, exclusive possession cannot be based on a use or occupation in common with a third party." *Conneaut Lake Park, Inc. v. Klingensmith, supra* at 595, 66 A. 2d at 829. But the prescriptive period ran from approximately August 18, 1937, to August 18, 1958. Anything defendants did after August 18, 1958 is not relevant. The garden and clothesline were continuations of activities conducted by the Priests when they occupied 220 North Main. These will be discussed below and can be discounted here. Mr. Andrews admitted that the golf cups were not installed until 1967. He did say that he had kept a trash barrel within the disputed strip from the time he moved in. The exact dates the other activities commenced were not indicated. Thus they are not relevant.

As to any activities that may have begun prior to August 18, 1958, such as the maintenance of the trash barrel, it must be noted that Mrs. Houseknecht generally denied seeing any other intrusions on to the strip by defendants other than the garden, the clothesline, and (from 1967) the golf cups. The jury could have disbelieved or given little weight to Mr. Andrews' statements to the contrary. He, unlike plaintiffs, failed to corroborate his testimony with demonstrative evidence. The issue of credibility was for the jury; we cannot pass on it anew and act as the trier of fact. *Burbage v. Boiler Engineering & Supply Co.*, 433 Pa. 319, 249 A. 2d 563 (1969). Moreover, "the evidence must be viewed in a light most favorable to the verdict winner. Evidence supporting the verdict is considered and the rest is rejected. Conflicts in testimony are resolved in favor of the verdict winner. *E.g.*, Connolly v. Philadelphia Transportation Co., 420 Pa. 280, 216 A. 2d 60 (1966); Szawlinsky v. Campbell, 402 Pa. 651, 168 A. 2d 581 (1961); Kuhns v. Brugger, 390 Pa. 331, 135 A. 2d 395 (1957)." *Glass v. Freeman*, 430 Pa. 21, 25, 240 A. 2d 825, 827-828 (1968).

Mrs. Houseknecht did testify that Lawson Priest planted a corn patch that extended onto the strip. Mr. Andrews turned this same area into a garden soon after his arrival. But this limited use does not destroy the exclusiveness of Mrs. Daye's possession. In general, exclusive possession can be established "by acts, which at the time, considering the state of the land, comport with ownership; viz., such acts as would ordinarily be exercised by an owner in appropriating land to his own use and the exclusion of others." *Family Land & Investment Co., Inc. v. Williams*, 273 Ala. 273, 278, 138 So. 2d 696, 699 (1961). Thus, "the claimant's possession need not be absolutely exclusive; it need only be a type of possession which would characterize an owner's use." *Norgard v. Busher*, 220 Or. 297, 308, 349 P.

2d 490, 496 (1960). Mrs. Daye's dominion over the disputed strip was quite apparent. In assuring its maintenance and using the area for family activities, she exercised all the control over the strip that could reasonably be expected in view of its character, short of erecting a fence between herself and her neighbors. *See Pulcifer v. Bishop,* 246 Mich. 579, 225 N.W. 3 (1929) (exclusive possession even though neighbors used shore and beach area without consent).

In addition, the intrusions were quite limited. Aside from the corn patch, the only other use the Priests are alleged to have made of the area was the erection of a clothesline, but this was with Mrs. Daye's permission. The strip was not an open unclaimed area that the Priests used as their own.* In fact both Mrs. Daye and Lawson Priest mistakenly thought that Mrs. Daye owned the land up to the line where Mrs. Houseknecht mowed. There is nothing to suggest that Mr. Priest thought that the patch where he planted his corn was excepted. Although he did not ask Mrs. Daye for permission to use the patch, his entry did not destroy her exclusive possession of the strip since he did not, by his actions, give notice of a denial of her asserted right to ownership of the entire area. *Barker v. Publishers' Paper Co.,* 78 N.H. 160, 97 A. 749 (1916). Two neighbors on good terms may quite possibly use each other's property to a limited extent without express consent, yet without a usurpatory intent.

Defendants' second contention is based on the mistaken impression under which Mrs. Daye and Lawson Priest operated. Defendants argue that "where both parties are mistaken as to the legal ownership of the

---

* This distinguishes the present case from *Henry v. Grove,* 356 Pa. 541, 52 A. 2d 451 (1947) and *Parks v. Pennsylvania R. R. Co.,* 301 Pa. 475, 152 A. 682 (1930). In both, the testimony revealed that the land was a common pasturage that could not be acquired by adverse possession.

claimed tract the possession by one who is erroneously thought to be the owner is not hostile and accordingly cannot be considered adverse." They rely principally on *Vlachos v. Witherow*, 3 Pa. D. & C. 2d 698 (1954), *aff'd*, 383 Pa. 174, 118 A. 2d 174 (1955). In *Vlachos*, a man mistakenly conveyed more land to his daughter than he intended. He continued to live on the parcel and willed it to his son and his heirs. The parcel was then conveyed to the claimants. The court rejected the claimants' contention that they owned the land by virtue of their predecessor's adverse possession. It relied on the established Pennsylvania rule that a vendor or grantor's possession becomes hostile only upon the commission of some unequivocal act brought to the actual knowledge of the purchaser or grantee. *Ingles v. Ingles*, 150 Pa. 397, 24 A. 677 (1892); *Cadwalader's Appeal*, 81 Pa. 194 (1876); *Olwine v. Holman*, 23 Pa. 279 (1854). Otherwise, the grantor's possession is deemed to be the possession of the grantee. In essence, the grantee must know that he owns the land which the grantor occupies. Grantors are given no such special consideration when their grantees claim rights by adverse possession. Neither are other parties. A grantor or true owner of land should know how much land he owns. There is no reason to protect him from his mistakes merely because the other party erroneously occupies his land under a mistaken claim of right.

It is true that some jurisdictions "hold that the possessor's mistaken belief in his ownership negatives the existence of a necessary hostile intent. . . . These jurisdictions identify hostility with the common-law tort of disseisin, i.e., forcible ouster. The theory is that one who does not know he is in possession of another's land cannot harbor the specific intent to oust the other out of his land." Note, A Reevaluation of Adverse Possession as Applied in Boundary Dispute Litigation, Rutgers-Camden, L.J. 293, 299 (1971). But most jurisdic-

tions "deem the animus of the possessor irrelevant. Rather, they look to the actual physical facts of the possession to determine if such circumstances of notoriety exist so that the true owner is put on notice. They represent a belief that the nature of the possession alone is what is important and that a sufficiently notorious possession will always be enough to alert the owner. Therefore, the hostility is implied if all other elements have been established." *Id.* at 298. *See also* Annot., 80 A.L.R. 2d 1171 (1961).

Pennsylvania follows the majority view. *See, e.g., Dimura v. Williams,* 446 Pa. 316, 286 A. 2d 370 (1972); *Adams v. Tamaqua Underwear Co.,* 105 Pa. Superior Ct. 339, 161 A. 416 (1932). Thus even though Mrs. Daye and Lawson Priest were laboring under a mutual mistake concerning the ownership of the strip, Mrs. Daye's possession was hostile.

The order is affirmed.