433 A.2d 483

**TIOGA COAL COMPANY**

**and**

**Robert Forepaugh**

v.

**SUPERMARKETS GENERAL CORPORATION.**

**Appeal of TIOGA COAL COMPANY.**

**TIOGA COAL COMPANY**

**and**

**Robert Forepaugh**

v.

**SUPERMARKETS GENERAL CORPORATION, Appellant.**

Superior Court of Pennsylvania.

Argued June 9, 1980.

Filed May 22, 1981.

Appellee's Reargument En Banc Denied Sept. 4, 1981.

Petition for Allowance of Appeal Granted Dec. 15, 1981.

Joseph J. Carlin, Philadelphia, for Tioga, appellant in No. 1885 and appellee in No. 1934.

Carl S. Primavera, Philadelphia, did not file a brief on behalf of Forepaugh, appellee.

Edward Greer, Philadelphia, for Supermarkets, appellant in No. 1934 and appellee in No. 1885.

Before BROSKY, HOFFMAN and CIRILLO, JJ.*

* Judge Vincent A. Cirillo of the Court of Common Pleas of Montgomery County, Pennsylvania, is sitting by designation.

HOFFMAN, Judge:

Appellant contends that the lower court's denial of its claim of title to certain land by adverse possession was based on a misconstruction of statutory law governing such claims. We agree and, accordingly, vacate in part the decree of the lower court and remand for proceedings consistent with this opinion.

Appellant, Tioga Coal Company (Tioga) is a partnership which owns a parcel of land on the corner of Tulip and Tioga Streets in Philadelphia, on which it conducts a retail fuel oil business. Appellee, Supermarkets General Corporation (Supermarkets), owns an adjoining, larger parcel of land on which it operates a Pathmark retail food store. The present dispute arose over the use of "Agate Street," a forty-foot-wide strip of land which lies within Supermarkets' boundaries and is ten inches from Tioga's southern boundary.[1] Since 1948, Tioga has used Agate Street for loading and parking its vehicles, as well as for receiving deliveries. In 1978, Supermarkets began to use Agate Street for deliveries to its newly constructed store. Tioga subsequently brought this action to quiet title to Agate Street by adverse possession.[2] Following extensive proceedings the lower court concluded that the statutory holding period governing Tioga's claim was forty years, and that since Tioga had used Agate Street for no longer than thirty-one years it had not acquired title by adverse possession. *Tioga Coal Co. v. Super-*

1. Agate Street is a "paper street" which was stricken from city records in the mid-1960's, before the public ever used or acquired any rights to it.

2. Tioga sought additionally to quiet title by adverse possession to a 10-inch-wide strip of land which lies within Supermarkets' boundaries immediately between Tioga's southern boundary and Agate Street. In 1948, Tioga erected a wall on this strip, which it has maintained to the present. Our holding as to Tioga's claim of title to Agate Street applies equally to Tioga's claim of title to this 10-inch-wide strip of land.

*markets General Corp.*, 3 Phila.Co.Rep. 53 (1979). This appeal followed.[3]

In *Lisowski v. Mastromarco*, 281 Pa.Super. 303, 305, 422 A.2d 180, 181 (1980), this Court noted that "[t]he foundation for title by adverse possession in this Commonwealth" is the Act of March 26, 1785, 2 Sm.L. 299, § 2, 12 P.S. § 72 (repealed) (hereinafter cited as section 72). That act provided:

> From henceforth no person or persons whatsoever shall make entry into any *manors, lands, tenements or hereditaments*, after the expiration of *twenty-one years* next after his, her or their right or title to the same first descended or accrued; nor shall any person or persons whatsoever have or maintain any writ of right, or any other real or possessory writ or action, for any *manor, lands, tenements or hereditaments*, of the seisin or possession of him, her or themselves, his, her or their ancestors or predecessors, nor declare or allege any other seisin or possession of him, her or themselves, his, her or their ancestors or predecessors, than within *twenty-one years* next before such writ, action or suit, so hereafter to be sued, commenced or brought.

**3.** The parties raised several other claims and counterclaims below, none of which is presently before us. First, Tioga claimed that it had acquired a prescriptive easement in Agate Street. The lower court denied this claim, and Tioga has not appealed that aspect of the lower court's decree. Additionally, Robert Forepaugh, an adjacent property owner, claimed title by adverse possession or, alternatively, a prescriptive easement in Agate Street. The lower court denied these claims, and Forepaugh filed an appeal which he subsequently discontinued. Finally, Supermarkets counterclaimed against both Tioga and Forepaugh, seeking injunctive relief and damages. The lower court denied these counterclaims, and Supermarkets filed an appeal at No. 1934 October Term, 1979. Because Supermarkets has failed to raise any issues for our consideration, however, we dismiss its appeal. *See Lascheid v. Hoover*, 278 Pa.Super. 261, 263 n.1, 420 A.2d 530, 531 n.1. (1980). Thus, the only matter now before us is the propriety of the lower court's refusal to quiet title to Agate Street in Tioga by adverse possession.

(emphasis added).[4]  This act and subsequent judicial decisions established that "one who claims title by adverse possession must prove that he had actual, continuous, exclusive, visible, notorious, distinct, and hostile possession of the land *for twenty-one years.*"  *Conneaut Lake Park, Inc. v. Klingensmith*, 362 Pa. 592, 594, 66 A.2d 828, 829 (1949) (citations omitted;  emphasis added).[5]

■  The legislature extended the holding period for acquiring title by adverse possession to forty years by the Act of April 14, 1851, P.L. 612, § 15, 12 P.S. § 77 (repealed) (hereinafter cited as section 77).  That act provided:

From henceforth, no person or persons whatsoever shall make entry into any *manors, lands, tenements, or hereditaments,* after the expiration of *forty years* next after his, her or their right or title to the same first descended or

4.  The Act of March 26, 1785 (2 Sm.L. 300, section 2), upon which title by adverse possession in Pennsylvania is based, says nothing about a transfer of title.  It provides merely that the owner of land loses forever his right to assert his title at the expiration of twenty-one years from the time a cause of action arose against another claimant of the land.  In *Miller v. Shaw*, 7 S. & R. 129, at p. 138, GIBSON, J., says:  "The Statute was never intended as a means of acquiring title, or as an encouragement to people to enter on each other's land with a view to hold it,—but to compel them to decide their controversies while transactions are recent and the evidence of them is attainable."  The courts, however, have necessarily held as a result of the Statute, that the other claimant obtains title at the end of the twenty-one-year period.  Since the Statute has barred the rights of the true and original owner, there is no one in the world who can successfully challenge the rights of the claimant in possession.  The latter, therefore, acquires title by operation of law, since he has the essential requisites of title,—i. e., a right to hold as against all the world.
V. Nicholson, *A Treatise on the Law Relating to Real Estate in Pennsylvania* § 279 (2d ed. 1926).  *See also* 2 Standard Pennsylvania Practice, chapt. 7, § 186 (rev. ed. 1956) ("Modern statutes of limitation operate, as a rule, not only to cut off one's right to bring an action for the recovery of real property which has been in the adverse possession of another for a specified time, but also to vest the disseisor with title.")  (footnote omitted).

5.  The legislature extended the right of entry of people under certain disabilities, including minors, married women, the insane, and the incarcerated.  *See* 12 P.S. § 73;  12 P.S. § 82.  *See also Lisowski v. Mastromarco, supra,* 281 Pa.Super. at 306 n. 1 & 2, 422 A.2d at 181 n. 1 & 2.

accrued, nor shall any person or persons whatsoever have or maintain any writ of right or any other real or personal writ or action for any *manors, lands, tenements, or hereditaments*, of the seizure or possession of him, her or themselves, his, her or their ancestors or predecessors, than within *forty years* next before such writ, action or suit so hereafter to be sued, commenced, or brought: Provided, That any person, never having right or title of entry as aforesaid, and who is now by law excepted from the general provisions of the act of March 26, 1785, for the limitation of actions, and the heir or heirs of such person, may, within five years from this time, enter or commence any action or suit, as he, she or they, or his, her or their ancestors or predecessors might have done before the passage of this act.

(emphasis added). The extension proved short-lived, however. The very next year the legislature limited the effect of section 77 by passing the Act of May 4, 1852, P.L. 569, § 7, 12 P.S. § 78 (repealed) (hereinafter cited as section 78), which provided:

The fifteenth section of an act entitled "An act relative to the commencement of actions, and for other purposes," approved the 14th day of April, 1851, [section 77,] is hereby construed to extend to and apply only to writs of right and other writs pertaining to *manorial lands in the city and county of Philadelphia.*

(emphasis added). It is the precise nature of the limitation which section 78 effected upon section 77 which is at issue in this case. Appellant contends that by its use of the term "manorial lands," the legislature limited the forty-year holding period to certain discrete lands in the city and county of Philadelphia. The lower court disagreed with this contention and concluded that "manorial lands" is not itself a limiting term, and that the forty-year holding period applied to all land within the city and county of Philadelphia.[6]

6. Sections 72, 77, and 78 were repealed by the Act of April 28, 1978, P.L. 202, No. 53, § 2(a)[26], [276] and [288] (JARA), effective June 27, 1978. In their place the Judiciary Act of 1976 established a uniform

■ The precise extent to which section 78 limits the applicability of the forty-year holding period has not previously been decided by our appellate courts. Indeed, despite being a part of our law for more than 125 years, the forty-year holding period has rarely been at issue in the reported decisions. *See Philadelphia Electric Co. v. Philadelphia*, 303 Pa. 422, 154 A. 492 (1931) (plaintiff sought to establish title to Philadelphia property which it had acquired from grantor who had lacked title; Court noted that despite fact that plaintiff's deeds were more than forty years old, section 77 was of no assistance to plaintiff because it had failed to prove actual possession of the property); *Aldine Realty Co. of Pittsburgh v. Manor Real Estate & Trust Co.*, 297 Pa. 583, 143 A. 56 (1929) (in approving claim of title to Pittsburgh property by adverse possession, Court noted in dictum that even under forty-year holding period of section 77, claimant would have acquired valid title). In several

21-year statute of limitations governing acquisition of title by adverse possession throughout the Commonwealth. Act of July 9, 1976, P.L. 586, No. 142, § 2, 42 Pa.C.S.A. § 5530, effective June 27, 1978. *See Lisowski v. Mastromarco, supra,* 281 Pa.Super. at 307 n.3, 422 A.2d at 182 n.3. The present action was commenced on September 12, 1978, approximately 2½ months after the repeal of sections 72, 77, and 78 and the establishment of the uniform 21-year statute. Nonetheless, the case requires us to consider the nature of the limitation which section 78 effected upon section 77. Section 25(a) of the Judiciary Act (which is set forth in a note following 42 Pa.C.S.A. § 5530) provides a one-year grace period for the commencement of any civil actions which were formerly subject to statutes of limitation longer than those established by the Act, and which were not fully barred as of June 26, 1978. Consequently, had Supermarkets brought an action to eject Tioga from Agate Street within the one-year grace period, the timeliness of such an action would necessarily have depended on whether or not the action was subject to the 40-year statute of limitations set forth in section 77, as modified by section 78. If it were determined that the 40-year statute of limitations applied to *all* land in Philadelphia, then Supermarkets' action would clearly have been timely. Conversely, if it were determined that the term "manorial lands" as used in section 78 limited the lands in Philadelphia to which the 40-year statute of limitations applied, then the timeliness of Supermarkets' action would have turned on whether Agate Street is manorial land. The result can be no different merely because Tioga, and not Supermarkets, instituted this action. Therefore, the question of the meaning of the repealed statutes is clearly before us.

cases involving adverse possession and prescriptive easement claims in Philadelphia,[7] there is no mention at all of the forty-year holding period, apparently because of the parties' failure to consider its applicability. *See Robin v. Brown*, 308 Pa. 123, 162 A. 161 (1932); *Baxter v. Girard Trust Co.*, 288 Pa. 256, 135 A. 620 (1927); *Martin v. Jackson*, 27 Pa. 504 (1856); *Adshead v. Sprung*, 248 Pa.Super. 253, 375 A.2d 83 (1977). In *Abrams v. Uenking*, 81 Pa.Super. 422, 426 (1923), this Court acknowledged in dictum that section 77 "was limited in its application by the legislature in 1852 . . . to manorial lands in the City and County of Philadelphia." The Court had no occasion, however, to consider the meaning of "manorial lands." *See also* 2 Standard Pennsylvania Practice, chapt. 7, § 187 (rev. ed. 1956); 22 P.L.E. *Limitation of Actions* § 22 (1959); *Ladner on Conveyancing in Pennsylvania* § 3.03 (3d ed. 1961); Fallon, *The Law of Conveyancing in Pennsylvania* § 15 (1902) (all acknowledging the restriction of the forty-year holding period to Philadelphia without considering whether the term "manorial lands" further limits the land to which the period applied).[8]

In *Lisowski v. Mastromarco, supra*, this Court concluded that the required holding period to establish title to land in Philadelphia by adverse possession was, before the present Judicial Code, forty years. The Court's conclusion, however, was in response to a contention "that Section 77 only applies to those Philadelphia landowners who suffer under the enumerated disabilities of 12 P.S. § 73, and that its forty year required holding period cannot be construed to extend to *all* landowners in Philadelphia." 281 Pa.Super. at 307, 422 A.2d at 182 (emphasis in original). The appellant did not raise, nor did the Court consider, the question of whether section 78's use of the term "manorial lands" limits the lands in

7. The holding period for acquisition of an easement by prescription is the same as that for acquisition of title by adverse possession. *Boyd v. Teeple*, 460 Pa. 91, 331 A.2d 433 (1975); *Bodman v. Bodman*, 456 Pa. 412, 321 A.2d 910 (1974).

8. The official journals of the 1852 sessions of the Pennsylvania Senate and House of Representatives likewise reveal no clues as to the legislative intent underlying section 78.

Philadelphia to which the forty-year holding period applied. Accordingly, the broad statement in *Lisowski* that "the forty year period of § 77 is the required time of possession before one may acquire title by adverse possession in Philadelphia," *id.*, 281 Pa.Super. at 310, 422 A.2d at 184, cannot be considered determinative of the question presented in this appeal.

Faced with this dearth of authority, we have resorted to an examination of the origins of land ownership in Pennsylvania to determine the meaning of "manorial lands" in the context of section 78. "What is now the State of Pennsylvania was granted to William Penn on March 4, 1681, by King Charles II, in satisfaction of a debt of 16,000 pounds due Admiral Penn, father of the founder." . V. Nicholson, *A Treatise on the Law Relating to Real Estate in Pennsylvania* § 5 (2d ed. 1926) (hereinafter cited as Nicholson). By the terms of the charter setting forth the grant, Penn and his successors were made absolute proprietaries of all lands within Pennsylvania, with power to dispose of such lands as they saw fit. 1 R. Bushong, *Pennsylvania Land Law* § 367 (1938) (hereinafter cited as Bushong); E. Price, *The Act for the Sale of Real Estate* 3 (1874). Penn subsequently established "Certain Conditions or Concessions" governing the disposition and settlement of land in the province, one of which was a reservation of one-tenth of the proprietary lands for himself and his successors. Wheeler, *Richard Penn's Manor of Andolhea*, 58 Pennsylvania Magazine of History and Biography 193, 194 (1934) (hereinafter cited as Wheeler). *See also* Nicholson at § 6. Thus, "[t]here were two kinds of titles in the Penn family,—that which they held as proprietors, and which later became public land, and that which each one owned in his private right." Nicholson at § 6.

Section 19 of the charter empowered Penn and his successors "to erect any parcels of land within the Province aforesaid into manors." Bushong at § 367. Pursuant to this authority, Penn and his sons established on their private lands what were referred to as "proprietary tenths or man-

ors." Nicholson at § 6; Wheeler at 194. These were not manors in the English feudal sense;[9] rather, they "were only manors in name, as so much land reserved or taken out of the general jurisdiction of the land office, so that grants could not be made within the terms."[10] R. Cadwalader, *A Practical Treatise on the Law of Ground Rents in Pennsylvania* 33 (1879) (footnote omitted) (hereinafter cited as Cadwalader). *See also* E. Mitchell, *The Law of Real Estate and Conveyancing in Pennsylvania* 88 (1890); Wheeler at 195 ("Strictly speaking a proprietary manor means a tract of land set aside for the use of some member of the Penn family."). The Penns erected many such manors throughout the province. "Volume IV. of the Third Series of *Pennsylvania Archives* contains drafts of nearly fifty manors and gives a list of about seventy such tracts. An even larger list is given in the text connected with *The Historical Map of Pennsylvania* published by [the Pennsylvania Historical] Society in 1875." Wheeler at 194. A number of these manors were situated in Philadelphia. IV Pennsylvania Archives, 3d Series (1894).

■ "After the Revolution it was considered incompatible with the democratic institutions of the new country for such vast real estate holdings to remain in the Penn family." Nicholson at § 7. Accordingly, the legislature passed the Act of November 27, 1779, 1 Sm.L. 479, §§ 5–13, 64 P.S.

---

**9.** The erection of such manors would, by the laws of England, have constituted the owners lords or barons, with their tenants or vassals holding under them, bound to attend and do suit and service at [their] courts. The court baron would have had jurisdiction over real actions concerning property in the manor, and debts or trespasses, under forty shillings: and the view of frankpledge (or court-leet) was an annual court of record, with conservation of the peace and punishment of minor offences. A manor could not legally exist without a court baron.

Bushong at § 368. *See also* 7 *Halsbury's Laws of England* ¶ 497 (2d ed. 1932) ("A manor has been defined as the seisin of a defined district, with the power of subinfeudation therein, and the existence of freeholders holding of the manor, and the right to a court baron, in which the feudatories are judges.") (footnote omitted).

**10.** The land office was established to handle the numerous transactions in which lands held by the Penns as proprietaries were granted for settlement. *See* Bushong at § 370.

§§ 1–8, commonly known as the Divesting Act. Bushong at § 387. That act divested the Penns of title to all lands which they had held as proprietaries and transferred title to the Commonwealth. In return the Penns were awarded 130,000 pounds.[11] The act excepted from divestiture all the private landholdings of the Penns, including "all the lands, called and known by the name of the proprietary tenths or manors, which were duly surveyed and returned into the land office on or before [July 4, 1776]." 64 P.S. § 4. *See generally Commonwealth ex rel. Reading v. Commissioners of Berks County*, 109 Pa. 214, 217 (1885) ("The Act of Divestiture (27th November, 1779), put an end to all rights of the proprietaries in the public domain, and limited those rights to their private estates and proprietary manors . . . ."); Bushong at § 387; Cadwalader at 49; Nicholson at § 7. Thus, proprietary manors registered in the land office as of July 4, 1776, survived the post-Revolution divestiture and continued to be held by the Penns and their successors. We believe that these are the "manorial lands" to which the legislature referred in section 78. Consequently, we conclude that section 78 limits the forty-year holding period of section 77 to land within proprietary manors established in the city and county of Philadelphia which the Penns retained following passage of the Divesting Act.

Our conclusion is based upon the foregoing historical recitation and a commonsense reading of the statutes establishing the various holding periods for acquiring title by adverse possession. Sections 72 and 77 both expressly apply to actions involving "any *manors, lands, tenements, or hereditaments.*" (Emphasis added.) Section 78 construes section 77 as applying "only to writs of right and other writs pertaining to *manorial lands in the city and county of Philadelphia.*" (Emphasis added.) The use of the apparently limiting term "manorial" makes it unlikely, in our view, that the legislature intended the forty-year holding period of

11. "If [the Penns] had seen fit to contest this act, a judicial battle of far reaching importance might have resulted, but their acceptance of the 130,000 pounds gave the Divesting Act the character of a purchase by the State." Nicholson at § 7.

section 77 to apply uniformly throughout Philadelphia. Indeed, the Statutory Construction Act of 1972 [12] expressly provides that "[g]eneral words shall be construed to take their meanings and be restricted by preceding particular words." 1 Pa.C.S.A. § 1903(b). *See also Commonwealth v. Buzak*, 197 Pa.Super. 514, 517, 179 A.2d 248, 250 (1962) ("It is a canon of statutory construction that where words of a later statute differ from those of a previous one on the same subject, they presumably are intended to have a different construction."). Thus, we cannot agree with the lower court that " 'manorial lands in the City and County of Philadelphia' refers to all lands within the City and County of Philadelphia." 3 Phila.Co.Rep. at 62.[13] Accordingly, we must vacate the decree of the lower court insofar as it concerns Tioga's claim of adverse possession, and remand for further proceedings. If on remand the court determines that Agate Street is manorial land as defined herein, then it shall apply the forty-year holding period as provided in sections 77 and 78, and deny Tioga's claim of adverse possession. Absent satisfactory proof that Agate Street is manori-

**12.** Act of December 6, 1972, P.L. 1339, No. 290 § 3; 1 Pa.C.S.A. § 1501 et seq.

**13.** The lower court based its conclusion on the fact that manorial lands in the English feudal sense included both lands retained by the lord for his own use ("demesne lands") and "[l]ands granted out by the lord to free tenants." 7 *Halsbury's Laws of England* ¶ 501 (2d ed. 1932) (footnote omitted). *See also* A. Casner & W. Leach, *Cases and Text on Property* 236 (2d ed. 1969). Under the reasoning of the lower court, however, *all* of Pennsylvania would be manorial land. We believe that this interpretation is at odds with the charter, with Penn's apparent intentions, and with the unique, nonfeudal character of the manors actually established in Pennsylvania. The charter distinguishes between Penn's powers as proprietary and his authority to erect manors. Accordingly, the charter seems to have contemplated the existence of both manorial and nonmanorial land in Pennsylvania. That Penn himself intended manorial lands to be distinct from the lands available for general settlement is evidenced by his establishment of manors on the lands reserved for the private use of himself and his family. These reserved lands were expressly exempted from the acreage limitations imposed on tracts available to the public. Wheeler at 193–94. Finally, as we have already noted, the manors established in Pennsylvania did not bear the essential attributes of the English feudal manors, and therefore are not directly comparable to them.

al land, the court shall evaluate Tioga's claim of adverse possession in light of the twenty-one-year holding period currently in effect. *See* 42 Pa.C.S.A. § 5530.[14]

No. 1885 October Term, 1979—Decree vacated insofar as it denies Tioga's claim of adverse possession; case remanded for proceedings consistent with this opinion.

No. 1934 October Term, 1979—Appeal dismissed.

14. Although Supermarkets has asserted generally in its brief that Tioga did not present sufficient evidence to prove that it had acquired title by adverse possession, Supermarkets has failed to specify in what particulars (other than duration of possession) Tioga's evidence was lacking. Similarly, the opinion of the lower court focuses primarily on the statute of limitations question and does not evaluate the sufficiency of Tioga's proof of adverse possession. Accordingly, if the lower court concludes on remand that the 21-year holding period applies, then it must determine whether Tioga's evidence is sufficient to establish its "actual, continuous, exclusive, visible, notorious, distinct, and hostile possession of the land for twenty-one years." *Conneaut Lake Park, Inc. v. Klingensmith*, 362 Pa. 592, 594, 66 A.2d 828, 829 (1949).